**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| JOHN DOE,<br><br>  Plaintiff,<br><br>   v.<br><br>JANE ROE, THE TRUSTEES OF PURDUE UNIVERSITY, ALYSSA C. ROLLOCK, KATHERINE L. SERMERSHEIM, LAURA ODOM, DAWN GROSS, CHRISTIE WRIGHT, and PANEL ADJUDICATORS,<br><br><br>  Defendants. | CASE NO.<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff John Doe ("John"),[1] by and through his attorney Eric Rosenberg of Rosenberg & Ball Co. LPA, files suit as follows against Defendants Jane Roe ("Jane"), the Trustees of Purdue University ("Purdue"); Purdue Vice President Alysa C. Rollock ("Rollock"); Vice Provost and Dean Katherine L. Sermersheim ("Sermersheim"); Purdue Senior Associate Director Christie Wright ("Wright"); Purdue investigators Laura Odom ("Odom") and Dawn Gross ("Gross"), and unidentified persons who adjudicated disciplinary charges against John ("Adjudicators").[2]

### THE NATURE OF THE CASE

1. The defendants' actions resulting in John's one-year suspension for sexual misconduct was the result of a flawed and unconstitutional disciplinary proceeding, which has

---

[1] Contemporaneous with filing of this complaint, John has filed a motion to proceed pseudonymously given the sensitive nature of the allegations and the stigma that attaches to the accused from unproved allegations of sexual misconduct—allegations John firmly denies.

[2] Defendants Jane, Purdue, Rollock, Sermersheim, Wright, Gross, Odum and Adjudicators are collectively referred to as "Defendants." Adjudicators and Wright are collectively referred to as "Adjudicators."

PAGE 1—COMPLAINT

irreparably harmed John personally and professionally. Defendants punished John based on countervailing and unsupported allegations of sexual misconduct following a one-time, consensual sexual encounter with Jane Roe ("Jane"), a female Purdue student. The specific facts of the encounter are set forth in Paragraphs 34 through 51, below.

2.      On December 10, 2019, John received notice of an investigation of possible harassment from Dean Sermersheim. Enclosed with this notice was a single-page report prepared by Purdue's Office of Institutional Integrity entitled, "Allegations Forming the Basis for the University-Initiated Investigation of Mr. [John Doe]." (hereinafter "Notice and Complaint").[3]

3.      In its Notice and Complaint Purdue stated that its Office of Institutional Integrity "has been informed of conduct by you, [John Doe], that, if substantiated, may constitute a violation of the University policy on Anti-Harassment (III.C.1)."[4]

4.      In truth, Jane made false allegations against John and offered false testimony about the circumstances of their sexual encounter. Jane offered this false testimony because she was motivated to conceal the fact of a *consensual* sexual encounter with John. Jane, who was known to have previously cheated on her boyfriend, was rightfully concerned about upsetting her then-boyfriend, who was expected to propose marriage.

5.      Jane reported the encounter with John as an assault to avoid being caught betraying her boyfriend once again. Jane also lied to friends by falsely claiming her sexual encounter with John was non-consensual and involved John plying Jane with alcohol until she was intoxicated. In fact, Jane initiated sexual contact and verbally consented throughout their sexual encounter.

---

[3]A redacted copy of the 12/10/19 Notice and Complaint is attached as Exhibit 1.
[4]Ex. 1: Notice and Complaint at 5.

6.     John provided evidence to defendants supporting his testimony that the sexual contact was consensual. Defendants ignored John's credible testimony and relied on implicit, gender-biased beliefs to discredit or disregard John's testimony and find that Jane is more credible.

7.     Defendants proceeded to conduct an unfair and inadequate investigation into the allegations. Defendants' flawed investigation resulted in an unlawful, unconstitutional disciplinary investigation and hearing, after which defendants improperly and unlawfully expelled John for a violation of Purdue's policies, which he did not commit.[5]

8.     More specifically, Purdue presented false and unreliable information.[6]

9.     Additionally, Purdue Policies violated John's due process and equal protection rights by creating a disciplinary process that deprives the accused of material information necessary to his defense.[7] Specifically, Purdue:

    a.   barred John from reviewing Gross and Odum's final report (hereinafter "Concealed Report") issued in support of Purdue's "University-Initiated investigation" even though the Adjudicators based their unlawful discipline of John on the Concealed Report;[8]

    b.   prohibited John from questioning Jane at the three-member panel hearing ("Panel Hearing");[9]

---

[5]John's expulsion was later reduced to a one-year suspension.

[6]*See* paragraphs 52-77 and 80, below, outlining the facts discrediting Jane's testimony—facts defendants disregarded and ignored owing to their gender-based biases.

[7]A copy of Purdue's policies governing the investigation and handling allegations of sexual misconduct is attached hereto as Exhibit 2.

[8]Notably, under Purdue's Title IX procedures investigators are required to prepare and submit a final investigation report (hereinafter "Concealed Report"), which includes the "investigator's determination of whether a violation of [policy] has occurred." Ex. 2 at 30. Even though adjudicators review the Concealed Report and base their disciplinary decisions on this report, the accused is not permitted to see this information. *Id*. at 30-31. *See* ¶¶ 149-154, above (alleging violations of John's Title IX, due process rights stemming from use of Concealed Report).

[9]The Purdue policy under which John was disciplined did not allow John to question his accuser, adverse witnesses or the investigators. Ex. 2 at 31. *See* ¶¶ 158-163, above (detailing how the prohibition against questioning of Wright, Jane and her witnesses violated John's Title IX, due process rights).

PAGE 3—COMPLAINT

    c.   disallowed witnesses at the panel hearing and thereby prohibited John from questioning adverse witnesses or presenting exculpatory testimony from corroborating witnesses;[10]

    d.   wrongfully disciplined John based on surrogate and secret testimony contained in the Concealed Report without giving John the opportunity to question defendant Wright about (i) how the evidence was collected; (ii) whether exculpatory evidence was excluded; and (iii) whether Purdue's bias against accused students and self-interest in the promoting a "University-Initiated investigation" prejudiced the case against John.[11]

    e.   allowed Jane to offer live testimony to the Adjudicators but prohibited John from hearing her testimony, and then failed to provide a transcript of her testimony, which is presumed to comprise the central evidence against him;[12]

    f.   prohibited John from establishing that the investigators' Preliminary Report and subsequent Concealed Report excluded exculpatory evidence of John's innocence by denying him access to audio recordings of the interviews with Jane and other witnesses;[13]

    g.   prevented John from preparing and presenting a fair and meaningful appeal by prohibiting him from recording the Panel Hearing, which was necessary to use as evidence in his appeal;[14]

    h.   violated John's due process and FERPA rights by giving Jane the rights of a "complainant" even though she was not a "party" to the "University-Initiated investigation" of John. For example, Jane had the right to review and respond to the Investigators' Preliminary Report and she provided testimony to the adjudicators; and,[15]

---

[10]*Id.*

[11]*Id.*

[12]The Purdue policy under which John was disciplined provided for evidentiary hearings but did not allow the accused student access to the live testimony and other evidence presented against him and did not make available a transcript of the hearing. *See* ¶¶ 159-161, above.

[13]The Purdue policy under which John was disciplined does not allow the accused to access audio recordings its investigators made of witness interviews. *See* ¶¶ 155-158, above (discussing same);

[14]The Purdue policy under which John was disciplined does not give accused students in university-initiated investigations of sexual misconduct the right to (i) obtain a copy of any reports related to these allegations that were issued by Purdue's investigators; or (ii) audio record evidence presented to the adjudicators during the Panel Hearing.

[15]The Purdue Policy under which John was disciplined provides that in "University initiated investigations" of sexual misconduct where Purdue is the "complainant," the non-party student who alleges

      i.   deprived John the opportunity to challenge the adjudicators for conflict of interest because (i) their identity is not revealed until the hearing commences, and (ii) there is no opportunity to review the adjudicators' background before the hearing and object to their appointment when bias is discovered.[16]

      j.   applied unequal, gender-biased assumptions against John, a male student, which biased assumptions impacted defendants' assessment of John's credibility and which also reflect a gender-based advocacy in favor of females accusing males of sexual misconduct.[17]

10.    As detailed below, defendants' actions violate the Seventh Circuit's controlling decision in *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019). John seeks declaratory and injunctive relief and damages to remedy the emotional, economic and physical harm stemming from defendants' unlawful conduct.

11.    Jane acted with malice when she falsely told Purdue investigators and adjudicators that John engaged in sexual contact without her consent and over her objections.

12.    Jane also intentionally, maliciously or negligently made false statements to third parties accusing John of sexually assaulting her on July 26, 2019.[18]

13.    Jane's Non-Privileged Defamation, which is the subject of this lawsuit, include both oral and written statements with her friend, her boyfriend and John's former-girlfriend. The subject Non-Privileged Defamation is outlined in the Factual Background Section below.

---

misconduct has rights which include the right to review and respond initial reports issued by Purdue's investigators and the right to appeal decisions made by Purdue adjudicators.

    [16]The Purdue policy under which John was disciplined does not require that Purdue provide accused students with the names of the adjudicators in advance of the hearing and thereby deprives the accused the opportunity to determine whether any of the adjudicators should be disqualified for bias. *See* ¶¶ 169-171, below.

    [17]The unconstitutional gender-biased assumptions and motives alleged herein are detailed at paragraphs 164-168, below.

    [18]These defamatory statements are hereinafter collectively referred to as Jane's "Non-Privileged Defamation."

## THE PARTIES

14.     John is a male citizen of Indiana whose current residence is in Indiana. He attended Purdue before his suspension.

15.     On information and belief, Jane is a female citizen of Indiana whose current residence is in Indiana. She attended Purdue all times relevant to this complaint.

16.     Purdue is land grant university established by the State of Indiana with its main campus located in West Lafayette, Indiana. Purdue is the beneficiary of state appropriates and is the recipient of state and federal grants and funding. Said funding requires Purdue comply with applicable due process protections and antidiscrimination laws, including, but not limited to, Title IX of the Educational Amendments of 1972 20 USC § 1681, *et seq.*

17.     Rollock was all times relevant to this complaint Purdue's Vice President for Ethics and Compliance and acted under the color or law. Rollock's responsibilities included, but were not limited to, ensuring Purdue complied with applicable due process, equal protection laws and Title IX of the Educational Amendments of 1972 20 USC § 1681, *et seq.*, Rollock is named in her official capacity only as an agent of Purdue. She is not named in her individual capacity. Upon information and belief, Rollock is a resident and citizen of Indiana.

18.     Sermersheim was all times relevant to this complaint Associate Vice Provost and Dean of Students and acted under the color or law. Sermersheim's responsibilities included, but were not limited to, ensuring Purdue with applicable due process, equal protection laws and Title IX of the Educational Amendments of 1972 20 USC § 1681, *et seq.*, Sermersheim is named in her official capacity only as an agent of Purdue. She is not named in her individual capacity. On information and belief, Sermersheim is a resident and citizen of Indiana.

19.     Wright was all times relevant to this complaint Purdue's Director of the Office of Institutional Equity and acted under the color or law. Wright's responsibilities included, but were not limited to, ensuring Purdue complied with applicable due process, equal protection laws and Title IX of the Educational Amendments of 1972 20 USC § 1681, *et seq.*, Wright is named in her official capacity only as an agent of Purdue. She is not named in her individual capacity. On information and belief, Wright is a resident and citizen of Indiana.

20.     Gross was all times relevant to this complaint an Investigator in Purdue's Office of Institutional Equity and acted under the color or law. Gross's responsibilities included, but were not limited to, ensuring Purdue complied with applicable due process, equal protection laws and Title IX of the Educational Amendments of 1972 20 USC § 1681, *et seq.*, is named in her official capacity only as an agent of Purdue. She is not named in her individual capacity. On information and belief, Gross is a resident and citizen of Indiana.

21.     Odom was all times relevant to this complaint an Investigator in Purdue's Office of Institutional Equity and acted under the color or law. Odom's responsibilities included, but were not limited to, ensuring Purdue complied with applicable due process, equal protection laws and Title IX of the Educational Amendments of 1972 20 USC § 1681, *et seq.*, is named in her official capacity only as an agent of Purdue and not in her individual capacity. On information and belief, Gross is a resident and citizen of Indiana.

22.     The unidentified Adjudicators were responsible for imposing erroneous discipline on John and acted under the color or law. The Adjudicators' responsibilities included, but were not limited to, ensuring Purdue complied with applicable due process, equal protection laws and Title IX of the Educational Amendments of 1972 20 USC § 1681, *et seq.*, Adjudicators are named

only in their official capacity as agents of Purdue. They are not named in their individual capacities. On information and belief, Adjudicators are residents and citizens of Indiana.

## JURISDICTION AND VENUE

23.     This Court has federal jurisdiction pursuant to 28 U.S.C. §1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq.* and 42 U.S.C. § 1983 are civil rights claims. The amount in controversy exceeds $75,000.

24.     This Court has personal jurisdiction over defendants on the grounds that all defendants are conducting business at Purdue within the State of Indiana.

25.     Venue rests with this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims herein occurred in West Lafayette, Indiana.

## FACTUAL BACKGROUND

26.     John has been an enthusiastic and diligent Purdue student engaged in a challenging dual major in electrical engineering technology and mechatronics engineering with a minor in military science and leadership.

27.     John has always been a determined, serious and hard-working student. John graduated from high school with a 3.88 GPA and received two diplomas: an Academic Honors diploma and a Technical Honors diploma. He consistently challenged himself by taking AP classes or classes that offered dual college credit. John's hard work and diligence paid off. He received a Hammond College Bound Scholarship that awarded him $10,500 annually toward tuition. As part of his scholarship, John has completed 160 hours of community service.

28.     John also participated in the Ivy Technical Community College (ITCC) program while in high school. It is a two-year program that allowed John to complete high school with an

associate degree. For his last two years of high school, John spent half a day in high school and the other half at ITCC. John earned an associate degree while in high school and entered Purdue as a junior.

29.     Combined with the ITCC transfer credits, John has earned a total of 170 GPA hours. John has repeatedly made Purdue's Dean's List and has received semester honors six times. His commitment to his studies is reflected in his cumulative GPA of 3.58. At the time of his suspension he was close to graduation and well on his way to a career as a military officer.

30.     Notably, John achieved academic success even while devoting significant time to athletics. He was as a starter on his school's varsity football team all fours years of school and also joined the school's wrestling team one year.

31.     But John is much more than a stellar student and athlete; he is a person of good character and good nature. When John's high school football coach was asked to comment publicly on John's nature, he praised John for his temperament, work ethic and solid character. He described John as a "very quiet leader" and "well-mannered."

32.     John's academic and leadership achievements are mirrored in his devotion to military service. He joined the Army National Guard while attending Purdue. And at Purdue, John solidified his commitment to military service. He joined the Army ROTC. This was to be the start of a decades-long military career. Following graduation from Purdue John was to enter the Army as a commissioned Army officer.

33.     As detailed below, however, Purdue's unlawful disciplinary proceeding, which has resulted in an erroneous finding of sexual misconduct, has upended his longstanding plan to become a military officer and devote his life to military service.

## John's Consensual Sexual Encounter with Jane

34.     John and Jane met in ROTC in Fall 2017. They had mutual friends and traveled in the same social circle. Although they were not close, the two were friendly and they occasionally socialized with others.

35.     Each had a significant other when, almost two years after they first met, John and Jane agreed to hang out one summer evening. The two had been communicating the preceding weeks and exchanged mildly flirtatious Snapchat messages. John told Jane she was attractive and asked whether she would date him if she were single.[19] In the course of these message exchanges, the two agreed to get together for drinks at John's place.

36.     This would be the first time John and Jane would spend time alone together. At the time, John was living with and dating Mary, a Purdue student, and Jane was dating Paul, also a Purdue student. Jane and Mary were friends.[20]

37.     On the evening of the alleged sexual misconduct, July 26, 2019, John agreed to pick Jane up from work. Their plans were simple: grab some drinks and watch a movie at John's apartment. Jane had already had a couple of beers before John arrived but showed no signs of intoxication.

38.     Jane knew John's roommates (one of whom was Mary, his girlfriend) would not be home. Jane knew this because when they were discussing a possible get together while working out together at the gym, John had told Jane they were both out of town. On the drive to his apartment, John reminded Jane that his roommates were not around.

---

[19]John did not keep copies of these messages and presumably Jane did not either since none was cited in or attached to the preliminary investigative report John reviewed.

[20]The Purdue students are referred to with the pseudonyms Mary and Paul to protect their identities and the identities of John Doe and Jane Roe. For ease of identification, the Appendix to this complaint contains a list of the persons named pseudonymously herein.

39.     Moreover, Jane herself knew that Mary was away at an ROTC basic training camp when she agreed to go to his place for drinks.

40.     Jane's knowledge that she and John would be alone is evidenced by the fact that she arrived with a bag packed with overnight items. On information and belief, Jane anticipated sleeping over knowing that John's roommates would not be there.

41.     After John picked Jane up, they returned to his apartment where she completed a homework assignment. The two then went to Meijer's grocery store to buy drinks.

42.     On their return, they selected a movie and began drinking. Over the course of approximately two hours, it is estimated that John had four beers and four shots. Jane had one to three beers and two or three shots.

43.     Throughout the movie, Jane became increasingly flirtatious and suggestive. She began moving closer to John. Eventually, John asked her directly if she wanted to kiss. Jane immediately grabbed his head, pulled him toward her and they began making out. John asked Jane if she wanted to move to the bedroom. She answered yes.

44.     They began undressing but before they continued with further sexual activity, Jane started to have second thoughts. First, she told John she was on her period. Then when John offered to put a towel down, Jane responded, "We shouldn't do this." John willingly assented and their sexual activity stopped there. John did not argue with Jane nor did he try to persuade her to continue. Instead, they both put some clothes back on, laid down on the bed and spooned together.

45.     During their spooning Jane restarted the sexual activity. She began making sexually suggestive moves: she reached back to grab John's hip and she began rubbing her buttocks against his groin. She also started moaning, which Jane herself acknowledged to investigators. As this

continued, John asked Jane straight up if she wanted to have sex. Jane cast aside earlier doubts about further sexual activity and said "yes" without hesitation.

46.     John went to the bathroom to grab a condom and Jane put it on him. She then got on top and held his arms down. Jane next inserted John's penis into her vagina. They changed positions. John got behind her. But before he climaxed, John stopped. He laid down. Although he did not express it directly to Jane, he signaled that he felt guilty about betraying Mary. At that point, the sexual intercourse ended. Jane told John they shouldn't tell anyone—they needed to keep it a secret. John agreed.

47.     As they continued to lay together cuddling, John complimented Jane's physique. She smiled and thanked him. They fell asleep naked holding each other.

48.     Notably, throughout the evening, although they had been drinking, both John and Jane were coherent and aware of their conduct.

49.     John has consistently recalled the details of their night and how their sexual encounter unfolded. He has offered considerable detail and has been consistent in his retelling.

50.     By all appearances, Jane too was aware of all that was happening that night. She never stumbled nor slurred her speech nor showed any sign that she was incapacitated.[21]

51.     Jane's own retelling of events—much of which is fabricated—shows that she understood what was happening, assented, and even took control of their sexual interaction. Her claim that she was too intoxicated to recall the details of the night is undermined by the detail

---

[21]The Purdue Policy under which John was disciplined distinguishes between intoxication and incapacitation. Purdue's Policy defines incapacitation to be the state in which "an individual cannot make rational decisions because they lack the capacity to give knowing Consent (e.g., to understand the who, what, where, why and how of their sexual interaction). . . . Intoxication is **not equivalent** to Incapacitation." Ex. 2 at 18 (emphasis added).

contained in her own testimony. Further, by Jane's own admission, she did not drink enough to black out.[22]

### The Morning After

52.     In the days after their consensual encounter, Jane falsely told others that the encounter was not consensual. But Jane's conduct the next morning gives the lie to her assault allegation.

53.     For instance, the investigative preliminary report set forth the following "Undisputed Facts":

> a.  *First*, the following morning John asked Jane if she would like to have breakfast together. She was happy to do so. Together they went to Meijer grocery store to purchase breakfast items. They returned to his apartment and made breakfast. Receipts John provided to defendants Gross and Odum confirmed this morning-after shopping trip.
>
> b.  *Second*, after breakfast they decided to watch a movie. Afterwards when John offered to take her home, Jane said she preferred to take a nap with him.
>
> c.  *Third*, Jane admitted telling John that she had fun with him.
>
> d.  *Fourth*, and equally important, Jane messaged her friend, Purdue student Jill, that same morning at 7:52 a.m., before she and John went to breakfast. Jane stated she needed to talk to someone because she felt awful. Jane told Jill "she wasn't straight forward enough to say no."

54.     Jane's conduct the morning after belies her claim that John engaged in sexual misconduct the night before. There is no allegation she was forced to accompany John to get breakfast and she decided of her own volition to return to his apartment to spend more time with John and then chose to nap with him. It defies belief and plausibility that Jane would have done

---

[22]The Preliminary Investigative Report reflected that Jane told her friend, Jill, a Purdue student, that she did not drink enough to black out. Jane's friend is referred to by the pseudonym Jill to protect her identity.

these things the morning after if she had been assaulted to the point of crying the night before, as falsely claimed.

55.     Moreover, when Jane reached out to Jill, she did not complain of an assault. Her lament is that of a young woman who wakes up regretting her infidelity, troubled that she gave in to her own sexual desire, and worried that if discovered, it will ruin her relationship with her boyfriend, Paul.[23]

56.     Such is Jane's motive to make a false allegation: Jane needed an excuse to explain a night spent alone with John that ended in a consensual sexual encounter. Jane likely regretted her choice because, as she put it, she "felt awful." Not surprisingly, Jane was racked with guilt and also felt anxious that their interlude might not remain a secret.

### Facts Discrediting Jane's Testimony and Illustrating the Lies

57.     Jane's after the fact retelling of events varied depending on her audience. As noted above, Jane *did not* tell her friend Jill that she was assaulted when she reached out to her the next morning. Rather, she implied that she felt awful because the sexual encounter should not have happened, which is to say Jane felt she should have resisted the urge to engage in sexual activity with John.

58.     In fact, when Jane texted Jill the next morning, Jane said she "wasn't straight forward enough to say no." Jane *did not* tell Jill then or later that she had been crying, resisting and saying "no." She didn't tell Jill this because it did not happen. Only later when Jane recounted her story to others did she begin to embellish her story with these false details.

---

[23]Paul, a Purdue student and member of ROTC, knew John and his then-girlfriend, Mary. Because of the close connections, even though John and Jane had agreed to keep their tryst a secret, Jane had reason to worry that their significant others might learn of their sexual encounter.

59.     When Jane spoke with Jill in person the next day about her night with John, again, she did not tell Jill that she was assaulted or that she cried for him to stop. Her complaint was far milder and she did not directly allege sexual misconduct. Jane told Jill that she felt "taken advantage of" and commented that her boyfriend would be mad. Jane added only that that she did not want to have sex.

60.     Importantly, nothing of Jane's confession to Jill is evidence that the sexual encounter was nonconsensual. These are not the statements of a woman forcibly assaulted to the point of crying. Rather, Jane's disclosure is that of a young woman who (i) regrets her decision, (ii) is troubled that she failed to resist her own sexual urges and (iii) fears that her boyfriend will discover her infidelity. To counter these feelings, Jane starts passing the blame to John.

61.     Similarly, one week after their sexual encounter, Jane communicated with John through Snapchat. Jane *did not* complain to John about being assaulted, she complained about feeling guilty that they had betrayed their partners and told John she felt "violated," and thus began Jane's fanciful story that John had wronged her.

62.     Jane could not afford to tell the truth—i.e., properly assume responsibility for her own actions—because she had previously betrayed Paul and the truth would have ended their relationship.

63.     Instead, Jane knew she needed to elicit sympathy from Paul and persuade Mary that John had assaulted her. She told them both that she protested during the encounter and resisted until she gave up. Jane falsely vilified John to portray herself a victim.

64.     Jane also told different stories to different people about her plans that night. When discussing the matter with Mary in text messages, Jane said that her plan was only "to drink and go home." Yet Jane had in fact planned and prepared to spend the night at John's place. She

admitted as much to Jill and even acknowledged to investigators that she had packed a bag for the night.

65.     In the same text message exchange with Mary, Jane said she thought Mary's roommates would be at the apartment that night. Yet by Mary's account—which the investigators credited—Jane knew beforehand that the roommates were out of town.[24] Indeed, Jane would not have arrived with a packed overnight bag unless she had anticipated staying the night.

66.     In the initial Notice and Complaint, Jane reportedly alleged that John "grabbed her arm," falsely implying that he had forced her to the bedroom. She later conceded to investigators this was not true.

67.     Jane also told investigators that she could not recall many details after she and John moved from the couch into the bedroom. She told Mary approximately one week after the encounter that she only "recalled bits and pieces of what happened." Yet Jane also told Mary contrary to what she told investigators—that after she allegedly said "no," she "was too drunk to remember anything else."

68.     In truth, Jane recalled very specific details of her consensual sexual encounter with John after they went into the bedroom and she selectively reported certain details when it suited her.

69.     Jane admitted to investigators specific details about what happened in the bedroom. Jane admitted she put a condom on John and then got on top of him. Yet Jane said nothing about this when relating the details to her boyfriend Paul and later to John's girlfriend, Mary. Jane

---

[24]John and Mary lived together in the apartment with two other roommates. Jane would not have prepared to spend the night with John if she thought his roommates were there because it would have suggested at a minimum that something was going on between John and Jane, and most certainly Mary's roommate would have told her.

omitted these details because they pointed to her consent to sexual activity with John and undermined her self-portrayal as "the innocent."

70.     When telling Paul about the encounter in a video chat, Jane lied directly and by omission. She told him only that she was assaulted but did not know whether protection was used. Jane lied because to acknowledge use of a condom implied the sexual activity was consensual.

71.     Jane also lied to Paul about her actions leading up to sex. She did not tell him she willingly kissed and fondled John on the couch because that too would lead to the inexorable conclusion that Jane was lying about the assault.

72.     Paul already had reason to distrust Jane because she had previously betrayed him with an ex-fiancé. Long before Jane's sexual encounter with John, Paul had discovered a used condom in her room and learned that she had slept with the ex-fiancé. This second instance of infidelity would have been catastrophic to her relationship with Paul, so to cover for her wrongdoing, Jane feigned herself the victim of a sexual assault.

73.     Mary corroborated this information in her written statement submitted in connection with John's appeal, Mary explained: "[Jane] has a history of having sexual relations with her ex-fiancé in the summer of 2019 while in a relationship with her boyfriend, [Paul]. Mary added, "A roommate [of Jane's] who had been interviewed, [Ruth], has provided evidence of these behaviors of Jane."[25]

74.     Mary also explained that "[Jane] has been known to dramatize and over exaggerate any slight inconvenience in her life. On numerous occasions, she refuses to take responsibility of her actions and blames others for any complications she experiences." Jane's roommate, Ruth, echoed this sentiment noting that Jane "constantly acted like the world was ending."

---

[25]Ruth is a pseudonym to protect the identity and privacy of Jane's roommate and other individuals referenced in this complaint.

75.     These character assessments, from women who know Jane well, taken with the notable inconsistencies in her own testimony provided reason to question Jane's veracity and credibility. In sum, the inconsistencies, dissembling, omissions and untruths in Jane's testimony provide substantial, if not compelling, evidence that her testimony was unreliable and untrustworthy.

76.     Additionally, Jane could not even be consistent in her text message exchange with Mary. When Mary pressed Jane to send her the messages that Jane claimed proved her account of her communications with John, Jane rebuffed Mary, telling her that she wouldn't have the messages. Moments later, however, Jane wrote, "I saved them." Mary asked again: "Send me screenshots." Jane then answered, "I don't have them. I ignored them because I never thought he would hurt you or me like that."

77.     Jane's obfuscation and lies are evidenced in her correspondence with Mary, which is inherently contradictory, and simply makes no sense. In truth, Jane did not save her messages with John because if anything they pointed to her own deception. John, for his part, admitted to engaging in a flirtatious Snapchat exchange with Jane. Jane, however, lied about it because if the messages were disclosed, these too would have pointed to her infidelity.

## An Inadequate Investigation, Flawed Hearing and Erroneous Disciplinary Finding

78.     After John received the notice of the allegations against him, he submitted a written response firmly denying wrongdoing. John stated:

> ████ kissed me on the couch. She then went into the bedroom with me. While in the bedroom she continued kissing me. ████ initiated sexual contact again when she placed herself on top of me and put a condom on me. She was the one who inserted my penis into her vagina and held my arms down with force.[26]

---

[26] A copy of John's written denial of the allegations (redacted to protect the individuals' privacy) is attached as Exhibit 3.

79.    Months later, on March 6, 2020, after investigators Gross and Odum interviewed John, Jane and other witnesses, John reviewed the Investigators' Preliminary Report ("Preliminary Report"). John responded in writing the following day, pointing out the inconsistencies and errors in the recorded information:

> The report indicates that the complainant told a variety of different stories, with little detail, to multiple people including the investigators. Many of the details that were provided by the complainant to the investigators support my version of what happened. Contrary to the complainant, my version of events has remained consistent and detailed throughout this investigation.[27]

80.    The Purdue defendants disregarded John's credible, consistent and corroborated testimony, and instead assumed Jane's veracity—even when evidence showed otherwise—and relied on her false testimony. For example,

1. John testified that Jane knew his roommates would not be present and witness corroboration.

2. Jane willingly drank; John did not pressure her to drink.

3. John provided receipts verifying that he and Jane ate breakfast together the morning after their consensual sexual encounter.

4. After consensual kissing on the couch, John stated that he asked if she wanted to move to the bedroom. Jane acknowledged that she did and grabbed his wrist nicely as they moved.

5. John testified that Jane decided against further sexual activity, and told him she was on her period, which Jane also said, so they stopped.

6. John testified that while spooning, Jane initiated sexual activity after she had halted it, and Jane for her part acknowledged sexual moaning while next to him.

7. John testified that Jane placed the condom on his penis. Jane affirmed this fact.

---

[27]A redacted copy of John's response to the inaccurate and flawed Preliminary Report ("Response") is attached as Exhibit 4.

8. Jane and John both acknowledged they had sexual intercourse while she was on top and holding his arms down, an undisputed fact inconsistent with Jane's claim of force.

9. The next morning after together buying items for breakfast, Jane returned to John's apartment to eat, watch a movie and take a nap.

10. Jane corroborated John's testimony by admitting she told him as they parted the next day that she had fun and wanted to hang out again.

11. John offered exculpatory testimony providing a motive for Jane's false allegation, testimony corroborated by one witness. He also named others who could confirm the same.

81.     Notwithstanding the consistencies in John's testimony, the investigators (motivated by gender-biased assumptions) were so certain of his guilt that they made errors of attribution in the Preliminary Report, and thereby violated John's due process and equal protection rights. For example, several times they attributed statements referring to John as those referring to Jane.

82.     The attribution errors served to enhance Jane's credibility and undermine John's veracity because the errors resulted in confusion and likely led investigators to believe John was not consistent in his testimony.

83.     These errors show that the defendant investigators were not sufficiently attentive to the details and did not care about getting meaningful facts straight. Rather, the investigators presumed John's guilt and needed only to piece together selective information supporting a predetermined outcome.

84.     John also provided important, exculpatory information in his Response to the Preliminary Report to help explain Jane's motive to fabricate allegations of assault. As noted above, Jane's roommate Ruth had told Mary (before her encounter with John) about Jane's prior infidelity: "When [Paul] found out about this he was upset and questioned [Jane] about it."

85.     John informed the investigators of Jane's motive to lie so they could gather this important, exculpatory impeachment evidence. They needed only to speak with Mary, Ruth and Paul to confirm what he told them.

86.     On information and belief, defendants Odum and Gross did not follow up on the information John provided in his Response, specifically information about Jane's motive for making a false allegation.[28] The investigators should have pursued this line of inquiry with the witnesses John named because if corroborated it would have undermined Jane's credibility and supported John's claim that he did nothing wrong.

87.     On information and belief investigators Gross and Odum did not present this exculpatory evidence anywhere within their conclusions in the final Concealed Report. Information supporting this belief is the fact that the Adjudicators asked John about Jane's possible motive for making a false allegation, which suggests they could not fathom any reason she would make a false allegation.

88.     Because Purdue would not disclose to John the final Concealed Report, which contained evidence against him, he cannot yet establish that defendants ignored this exculpatory evidence and failed to follow up with these witnesses and investigate further.[29]

89.     Purdue policy prohibits John from accessing the final Concealed Report even though it contains additional evidence and information that is shared with the adjudicators and is used in determining guilt.[30]

---

[28] *See* Ex. 4, John's Response at ¶ 4.
[29] *See* footnote 8, above.
[30] Under current Title IX regulations (effective August 14, 2020), universities and colleges can no longer withhold this information from accused students. The U.S. Department of Education reasoned it essential to provide parties with "full access to the evidence gathered, and to the investigative report that summarizes the relevant evidence, so the parties may make corrections, provide appropriate context, and prepare their responses and defenses before a decision-maker reaches a determination regarding responsibility." https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf at page 1023.

PAGE 21—COMPLAINT

90.     Further, the defendant Adjudicators denied John a fair hearing by failing to investigate Jane's possible motive to make a false allegation. Again, John's Response to the Preliminary Report (which was provided to the Adjudicators) identified information about Jane's possible reason for lying. John specifically identified the persons with knowledge about "additional possible motives for why [Jane] would fabricate these allegations."

91.     After receiving information about Jane's possible motive to fabricate an allegation, the Adjudicators should have heard from the witnesses because they offered the exculpatory evidence—meaningful evidence that undermined Jane's credibility. *See Doe v. Purdue*, 928 F.3d 652, 669 (7th Cir. 2019). The adjudicators made no effort to hear from these witnesses. To repeat, the only witnesses at the hearing were John and Jane. Thus, the Adjudicators erred in *relying only on Jane's allegation* to determine John was responsible for sexual misconduct. *Id.*

92.     Although defendant Wright's role at the hearing is to be a *neutral* factfinder along with the Adjudicators, she was not. Wright actively undermined John's testimony and effectively acted as his prosecutor by questioning and casting doubt on his testimony.

93.     For example, when John answered the adjudicators' questions seemingly to their satisfaction, defendant Wright followed up by pressing John with cross-examination style questions designed to inculpate or discredit him.

94.     On information and belief, defendant Wright did not ask Jane similarly probing cross-examination questions that would point to the falsity of her allegations. For example, it is believed Wright did not ask Jane why she put the condom on John. Nor did Wright ask how it came to be that Jane was allegedly assaulted when she was admittedly in a position of sexual dominance straddling John while holding his hands down.

---

(last accessed 11/09/20) (official version of document to be published in the Federal Register not yet scheduled for publication).

95.     On information and belief, Wright did not ask Jane any probing or meaningful questions that go to the heart of the question of consent because Purdue has adopted a "trauma-informed" training program for its Title IX employees—a program instructing that "hearings should be 'conducted in a manner that does not inflict additional trauma on the complainant.'" *See Norris v. Univ. of Colorado*, *Boulder*, 362 F. Supp.3d 1001 (D. Colo. 2019).

96.     Notably, neither Wright nor the Adjudicators asked John any questions about his description of their sexual activity. For example, (i) they did not ask how it was Jane inserted his penis in her vagina (without asking him for permission); (ii) they did not ask him how it was she Jane came to hold his arms down with force; and (iii) they did not ask John how he felt about it all.

97.     Following the hearing, on April 21, 2020, John received a notice from defendant Wright (hereinafter "Notice of Determination") finding him responsible for sexual violence and imposing a penalty of expulsion from Purdue. Defendant Wright prepared the Notice of Determination after "meeting . . . and consulting with the Panel [Adjudicators]."[31]

98.     In the Notice of Determination, defendant Wright excused and explained away inconsistencies and contradictions in Jane's testimony as trauma-related or alcohol induced.

99.     On information and belief, defendants Gross, Odom, Wright and the Adjudicators evinced a bias in favor of Jane, the accuser, and against John because Purdue has adopted a "trauma-informed" practice that favors accusers.

100.    On information and belief, defendant Wright has received extensive training from ATIXA, a private organization offering instruction in Title IX compliance to university Title IX coordinators, investigators and administrators.

---

[31]Ex. 5, Notice of Determination at 2.

101.    Relevant to this case, ATIXA teaches that inconsistencies in statements stem from neurobiologically-induced trauma. More specifically, this training teaches that the omission of information and inconsistency in retelling the story is proof that the student making the accusation has been victimized and should be believed. This is commonly known as "trauma-informed" approach in the handling of alleged sexual harassment.

102.    Here, defendant Wright improperly employed "trauma-informed" practices when evaluating Jane's testimony and determining that she was credible notwithstanding her inconsistencies and John was not. *See Norris v. Univ. of Colorado*, *Boulder*, 362 F. Supp.3d 1001 (D. Colo. 2019).[32]

103.    As alleged above, on information and belief, the Adjudicators' questioning of Jane manifested a predetermined belief in Jane's veracity (and conversely John's mendacity) by not questioning her credibility. Evidence supporting this belief includes the trauma-informed training adopted by Purdue as well as information contained in the Notice of Responsibility finding Jane and her witnesses more credible even though the finding was not supported by a preponderance of evidence. *See* ¶¶ 52-77, above (discussing credibility).

104.    Defendant Wright further betrayed her gender bias in favor of Jane (a female) by applying a double standard that assumes Jane is credible when alleging that she did not consent to sex even though she (i) voluntarily restarted sexual activity; (ii) placed the condom on John; and (ii) straddled him in a dominant sexual position. *See* ¶¶ 165-168, below (discussing defendant Wright's bias).

---

[32]Further, there is no scientific support for the assertion that trauma leads to inconsistent statements or that inconsistent statements can be explained by trauma. Dr. Daniel Reisberg, Reed College emeritus professor in memory and cognition psychology, addresses these fallacies in his written report ("Reisberg Rpt.") at pages 5 and 7-8, attached as Exhibit 6.

105.    Defendant Wright also revealed her own bias against John and her presumption of his guilt by conflating and mischaracterizing the testimony. To discredit John, defendant Wright observed that John told investigators "he stopped having sex when he started to feel guilty" about betraying Mary. She contrasted this disclosure with his later statement to Mary that he and Jane stopped sexual activity because Jane said "no." In fact, as explained above, both statements are true.

106.    As alleged in paragraphs 44 through 46, above, Jane did stop sexual activity initially, but she voluntarily resumed sexual activity soon thereafter while they were spooning. Not long after they started having sex, John started feeling guilty about his infidelity. For this reason, John ended sexual intercourse before he climaxed.

107.    An impartial examiner or evaluator would have understood that John's testimony was not contradictory and would have conveyed these exculpatory details. Instead, defendants Odum, Gross and Wright ignored Jane's conduct—conduct that evinced a willingness to have sex—and then mischaracterized John's all-important testimony as inconsistent to make the case against him.

108.    Defendant Wright also misstated Mary's testimony and used it against John. She wrote in the Notice of Determination: "According to [Mary], in explaining the incident, [John], himself told her that [Jane] had told him "no" multiple times during the encounter . . ."[33]

109.    In fact, Mary said no such thing. Mary corrected this significant factual error in a subsequent written submission on appeal, wherein Mary affirmed that "[John] stated that [Jane] had said "no" on only one occasion."[34] Mary was, in fact, referring to the moment when Jane had

---

[33]Exhibit 5, Notice of Determination at 2.
[34]On information and belief, the Adjudicators relied on this false evidence because in the hearing they asked John about his alleged statement to Mary that Jane said "no" multiple times. This was not Mary's testimony. Again, Mary had to correct this erroneous claim in her appeal statement.

PAGE 25—COMPLAINT

second thoughts about sexual activity and told John she was on her period so they should stop. Mary's testimony is wholly consistent with that of John.

110.    John's testimony that Jane stopped sexual activity—before intercourse—was truthful. It is equally true that Jane restarted sexual activity; they had intercourse; and John then ended their sexual activity before he climaxed because he was feeling guilty.

111.    Owing to defendant's implicit bias against those accused of sexual misconduct, Wright selectively relied on certain testimony, ignored contrary details and ultimately mischaracterized testimony that corroborated John, all for purposes of discrediting him unfairly.

112.    On information and belief, defendant Wright and the Adjudicators relied on the false evidence that John disputed. Evidence supporting this belief includes the information contained in the Notice of Responsibility, finding that Jane and her witnesses were more credible than John, even though John's testimony was consistent and largely corroborated by Jane and others and Jane's testimony was inconsistent and contradictory. *See* ¶¶ 52-77, above (discussing credibility).

113.    Defendant Purdue also erred by prohibiting John from listening to Jane's testimony and depriving him of the right to cross-examine or question Jane.

114.    Consequently, John had no opportunity to refute incorrect testimony: he could not clarify misstatements or mischaracterizations of his own testimony nor could he rebut proffered false testimony.

115.    Lastly, the Adjudicators had no basis to find Jane's witnesses more credible because they never heard from them. The Adjudicators only heard testimony from John and Jane. Thus, it

was fundamentally unfair to make a credibility determination regarding other witnesses without hearing from them. *Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019).

116.    On May 1, 2020 John appealed the disciplinary finding of responsibility for sexual violence and harassment and the sanction. Eight days later, defendant Rollock upheld the determination of responsibility but reduced the expulsion sanction to a one-year suspension.

117.    Notwithstanding the sanction modification, as alleged below, Purdue's determination of John's guilt is fundamentally flawed. It stems from a hearing and appeal process that deprived John basic equal protection and due process rights guaranteed by the U.S. Constitution and by Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, *et seq*. and its implementing regulations.

John's Academic Future, Professional Military Career and Reputation Have Been Irreparably Damaged by Purdue's Violations of John's Due Process Rights

118.    As a result of Purdue's unlawful actions, John's reputation has been irreparably damaged: his academic career has been compromised and his long-standing professional career plans to become a military officer have been destroyed.

119.    Until this unlawful proceeding, which resulted in an erroneous disciplinary action, John had an untarnished, highly successful academic record. With his excellent grades and superb performance in his ROTC military leadership courses, John was well on his way to a successful career in the ranks of military leadership. These long-held career aspirations are now derailed.

120.    Before John's suspension, he was on track to complete his coursework and Army ROTC program requirements, which would lead directly to a position as a commissioned Army officer. This is no longer an option.

121.    As detailed below (in paragraphs 180-182), Purdue notified John's ROTC commander, Lieutenant Colonel Schmidt, of the disciplinary action and resulting suspension. Lt.

Col. Schmidt has since informed John that he should expect to be disenrolled (i.e., removed) from the Army ROTC program based on the information Purdue shared.

122.    Put simply, the information Purdue disclosed about John's disciplinary proceeding ends his military career. While John might still be entitled to an honorable discharge, any hope of a decades long career in the military is over. The Purdue sanction forecloses a professional military career.

123.    Similarly, John's ability and plans to pursue an undergraduate and graduate degrees have been severely compromised. On information and belief, the large majority of colleges and universities have transfer and admission policies that forbid the acceptance of students who have been suspended or expelled for sexual misconduct.[35]

124.    Moreover, John has been deprived of the value of the financial resources invested in his Purdue education and is likely to lose the scholarship he received to support his educational pursuits.

125.    John files this lawsuit because he seeks to correct Purdue's wrongful action. Specifically, he seeks reinstatement at Purdue University so that he can complete his undergraduate degree, complete the Army ROTC program, and enter the Army as a commissioned officer.

126.    On information and belief, Purdue defendants have the authority to reinstate John.

//

//

//

//

---

[35] *See generally* Declaration of Cynthia Purcell Garrett (hereinafter "Garrett Decl."), attached hereto as Exhibit 7.

## COUNT I
### Fourteenth Amendment, 42 U.S.C. § 1983
### Due Process Violation
(against Purdue Defendants only)

127.     John repeats and re-alleges each and every allegation as if fully set forth herein.

128.     The Due Process Clause of the United States Constitution is implicated by higher education disciplinary decisions, including the disciplinary decisions under Purdue's policies.

129.     As Purdue promised and as guaranteed by the United States Constitution, John was entitled to a meaningful opportunity to be heard and a process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he faced.

130.     Before enrolling in Purdue, John relied on Purdue's promise—as a public university—to honor John's due process rights under the United States Constitution. For his part, John understood his obligation to comply with Purdue policies.

131.     John reviewed and relied on the assurances and promises that Purdue would follow and comply with the numerous policies and procedures adopted and put forth by Purdue, including those assuring him of a right to procedural due process.

132.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." In this case, defendants are state actors subject to the Fourteenth Amendment.

133.     Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

PAGE 29—COMPLAINT

134.    The U.S. Department of Justice has recently codified the minimum due process accused students are entitled to in disciplinary proceedings. As of August 14, 2020, Department of Education's Office of Civil Rights adopted formal, enforceable regulations designed to "achieve fairness and reliable outcomes" by requiring necessary due process protections—protections that John did not have during his disciplinary proceedings.[36] These policies and protections include:

- *Presumption of innocence.* A presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made.

- *Meaningful access to evidence.* Schools must send the parties copies of the evidence in hard copy or electronic format, so they have adequate time to inspect, review, digest and analyze the evidence and respond in a meaningful manner.

- *Live hearings with cross-examination.* Schools must permit each party's advisor to ask the other party and any witnesses relevant questions, including questions challenging credibility.

- *Unbiased Title IX personnel and decision-makers.* All persons must be free from conflicts of interest or bias against respondents.

135.    John had none of these protections, which are now enshrined in law. Consequently, as detailed in this Complaint, the Purdue defendants unlawfully suspended John based on a flawed proceeding with a predetermined outcome and lacking the quantum of evidence needed to make a finding of sexual misconduct.

136.    Defendants punished John under a process that failed to satisfy the minimum standards of fairness required by the Due Process Clause.

---

[36]The U.S. Department of Education has summarized key provisions from the new regulation in a document entitled, *Summary of Major Provisions of the Department of Education's Title IX Final Rule*. A copy of this summary is located at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf (last accessed on Nov. 2, 2020).

PAGE 30—COMPLAINT

<u>Purdue's Hearing Failed to Provide John the Minimum Standards of Due Process
Established in *Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019)</u>

137.     Purdue's investigation and hearing deprived John of his established due process rights under the Seventh Circuit's *Purdue* decision. *Purdue* held: "To satisfy the Due Process Clause, 'a hearing must be a real one, not a sham or pretense.'" 928 F.3d at 663 (quoting *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir. 2006)).

138.     The Purdue defendants violated this mandate. Although Purdue investigated and had a hearing, the Purdue procedures as designed and implemented presume the accused's guilt, impair the search for truth and thereby violate fundamental tenets of due process. Consequently, Purdue's process deprived John of a fair and impartial hearing. More specifically, the investigation and hearing deprived John due process in the following ways:

139.     *<u>The Purdue Defendants presumed John guilty.</u>* Contrary to law, the defendants revealed their gender bias and presumption of John's guilt. They did so by explaining Jane's inconsistent and contradictory testimony as a function of intoxication and unsubstantiated, general conclusions of trauma-related memory failure. *See* ¶¶ 95, 99-103, above.

140.     Defendant Wright wrongly attributed conflicts and inconsistencies in Jane's testimony as trauma related. Specifically, she found Jane "a credible witness" because she is "informed that individuals who experience trauma may have difficulty remembering all, or a portion, of the traumatic event and that recall may increase over time."[37] Defendant Wright's finding is contrary to established science and research in memory and cognition and is not a valid reason to credit Jane's testimony.

---

[37] 04/21/20 Notice of Determination at 2, attached as Exhibit 5.

141.    Memory of traumatic events as well as memories of prosaic or mundane events are selective and fragmentary. Dr. Daniel Reisberg, a published research psychologist and expert in the area of memory science, identifies three reasons Wright had no basis to attribute inconsistencies in testimony as evidence of trauma. Dr. Reisberg explains:

> First, while memory for traumatic events is often selective and fragmented, *the same is true for memory for events that were not at all traumatic, and the same is also true for memories that are laced with inaccuracies.* Therefore, the selectivity and fragmentation cannot be used as some sort of evidence that the person is recalling a traumatic event or is recalling correctly.

> Second, there is no reason to believe that trauma produces <u>inconsistent</u> memories. If someone's report is inconsistent, therefore, this pattern often provides reason to distrust one or another of the inconsistent elements.

> Third, the pattern of selectivity, associated with trauma, is a result of the initial recording process – that is, the process in which the memory was created from the start. Therefore, the Wright letter is <u>correct</u> in stating that "individuals who experience trauma may have difficulty remembering all, or a portion, of the traumatic event," but [Wright] is broadly <u>incorrect</u> when [she] then concludes "that recall may increase over time."[38]

142.    Thus, defendant Wright had no rational or scientific basis to conclude that Jane was credible based on the erroneous theory that trauma initially suppressed memories that she later recalled. Nor was there any basis to conclude that her inconsistent statements are indicative of trauma flowing from an alleged sexual assault.

143.    Jane did not have a memory lapse and her statements showed this. Weeks after the fact she was retelling the tale of her alleged sexual assault from beginning to end. Though Jane provided detailed accounts to others, on information and belief, the investigators refused to

---

[38]Ex. 6, Reisberg Rpt. at 8.

consider the most plausible and logical explanation for her inconsistent and contradictory testimony: it was false. *See* ¶¶ 52-77, above.

144.    The real explanation for Jane's ever evolving and more detailed story of what happened when she went to John's apartment is that she was lying. And although Jane conveniently told Mary that she was only recalling "bits and pieces of what happened," her assertion makes no sense because Jane cannot recall memories that were never created in the first instance.[39]

145.    The most innocent—though unlikely—explanation for Jane's inconsistent and contradictory testimony is that she was reconstructing (or confabulating) events so that the circumstances of a regretful encounter would comport with her beliefs, assumptions and preferences about her behavior at the time.[40]

146.    Thus, Jane's conflicting stories and the embellishments in her retelling of events demonstrate that her testimony was both unreliable and false. Notably, Jane's story morphed and became more elaborate when she faced Mary's incredulous questioning.

147.    In sum, whether intentionally false or an unwitting confabulation, Jane's testimony was not to be credited over John. Nor should it have been treated as an indicium of trauma.

148.    *Purdue Policies deprived John meaningful access to relevant evidence necessary to his defense.* The Purdue Defendants deprived John access to the evidence used against him. This evidence included, but is not limited to, the audio recordings of witness interviews as well as the Concealed Report that defendants Gross and Odom prepared.

---

[39]Jane's alcohol consumption might have "interfere[d] with the processes needed to record memories from the start. . . . On this basis, if no memory is created (or "encoded"), then there is no prospect for recovering memory later." Ex. 6, Reisberg Report at 7. Speaking metaphorically, "If you never write something onto a page, you can not read information off the page later." *Id*.

[40]*Id*.

149. The Concealed Report, referred to as the "final investigation report" in Purdue's *Procedures for Resolving Complaints of Discrimination*, was provided to Wright and the Adjudicators. This final investigation report included (i) an assessment of John and Jane's credibility; (ii) facts and information supporting each finding that were more convincing than the countervailing facts and information John offered; and (iii) the basis upon which the investigator determined John was guilty.[41]

150. On information and belief, the Concealed Report did not contain the exculpatory information set forth in John's response to the Preliminary Report. And by depriving John access to the Concealed report, defendants denied John access to evidence the decisionmakers relied on in determining guilt and punishment. *See* ¶¶ 87-89, above.

151. On information and belief, at the time of John's hearing defendants knew that to withhold this evidence violates the accused's due process rights. Almost one year earlier, in a similar case involving Purdue University, the Seventh Circuit held the failure to disclose its evidence to the accused violates due process: "[W]ithholding the evidence on which [Purdue] relied in adjudicating his guilt was itself sufficient to render the process fundamentally unfair." *Doe v. Purdue*, 928 F.3d 652, 663 (7th Cir. 2019).

//

//

---

[41]*See* Ex. 2, Purdue Policy at 53, which reads in pertinent part: "The University investigator will submit a final investigation report . . . The report will include findings based on a preponderance of the evidence that (1) the allegations cannot be substantiated or some or all of the allegations are substantiated, (2) a statement as to whether the Formal Complaint was knowingly false or malicious, and (3) if material to the determination as to whether or not a violation of one or both of the Policies has occurred, an assessment of the credibility of the Complainant and the Respondent(s). . . . This preponderance of the evidence standard requires that the facts and information supporting each finding are more convincing than the facts and information offered in opposition to such finding. The report will include the basis upon which the University Investigator reached their conclusions."

152.    More recently, in a case applying the *Purdue* standard, this Court likewise held that allegations that the university withheld its Final Report (i.e., the "Concealed Report") from the accused student are sufficient to state a procedural due process claim. This Court reasoned:

> Critically, the Plaintiff was also prohibited from reviewing the Concealed Report that was submitted to the Panel. The Panel relied upon the Concealed Report when finding that the Plaintiff violated University Policy. Because the Defendants [Purdue] withheld evidence they used to find the Plaintiff guilty of violating university policy, the disciplinary process was fundamentally unfair. *See Doe*, 928 F.3d at 663. Accordingly, the Plaintiff has stated a claim for a procedural due process violation.

*John Doe v. Purdue University* ("*Doe II*"), Case No. 4:19-cv-00056-TLS-JPK (N.D. Ind. June 1, 2020) (ECF 61) (internal citations to plaintiff's complaint omitted).

153.    Accordingly, the Purdue defendants should have granted John access to the Concealed Report prepared in his case. Defendants failure to do so violated John's due process rights.

154.    Similarly, Purdue's policy impaired John's ability to defend himself fully and fairly against Jane's false allegation by denying John <u>meaningful</u> access to the evidence gathered against him. For example, John was prohibited from retaining a copy of the Preliminary Report and prohibited from accessing the audio recordings and other source documents gathered during the investigation.

155.    Instead, Purdue only allowed John to review a copy of the Preliminary Report from a secure location. John's handwritten notes of the information in the Preliminary Report are wholly inadequate to digest and record of evidence gathered against him. In the short time allowed to review the report, there was no meaningful opportunity to analyze the detailed information and capture all instances of ambiguous or contradictory testimony.

156.    While John captured some obvious inconsistencies by taking handwritten notes, nuanced and subtle variances in witness statements were impossible to record on the spot. John would have had to spend hours transcribing word for word everything in the Preliminary Report. This he could not do. Likewise, John was not permitted copies of other documents investigators had gathered.

157.    Under the circumstances permitted for review, John did not have a fair opportunity to identify and record discrepancies contained among the many documents investigators Odum and Gross gathered. Therefore, John could not prepare a meaningful response to defend against the false accusations in the hearing or on appeal.

158.    _Purdue denied John the opportunity to listen to or cross-examine his accusers._ Purdue's denial of cross-examination of his accuser or adverse witnesses fundamentally impaired his defense in this "he-said/she-said" case. Because neither John nor his advisor could listen to or question his accuser, he could not adduce exculpatory evidence of Jane's bias or motive to make a false accusation. Essentially, Purdue denied John the constitutionally guaranteed right to confront his accuser.[42]

159.    There were no eyewitnesses to John and Jane's sexual activities of July 26, 2019 and no physical evidence. Jane's allegations against John rested entirely on a credibility assessment—the decision to believe Jane over John.

---

[42]Student disciplinary proceedings involving claims of sexual misconduct essentially amount to quasi-criminal proceedings because of the life-long stigma and harm that attaches to the accused student found guilty of sexual assault. _See_ ¶¶ 174-176 and 185, below. To deprive the accused student of the right to confront his accuser is to deny him a right enshrined in centuries of law. This right is so central to a fair hearing that the Department of Education now requires cross-examination in all university disciplinary proceedings involving allegations of sexual misconduct. _See_ ¶ 134, above.

160.    In short, Purdue deprived John a fair opportunity to defend himself because he could not challenge the reliability of Jane's accusations—accusations the Purdue defendants assumed to be true notwithstanding substantive inconsistencies in her testimony.

161.    Moreover, because Purdue deprived John of the opportunity to examine defendant Wright about the investigation, he could not determine how evidence was collected; whether exculpatory evidence was excluded; and, whether Purdue's bias against accused students or self-interest in substantiating a "University-initiated investigation" prejudiced defendants' view of the case against him.

162.    Even before the adoption of the new Title IX regulations requiring live hearings and cross-examination, well over twenty-five courts had determined that accused students have a right to cross-examination in disciplinary proceedings involving "he-said/she-said" allegations. These courts have recognized the importance of cross-examination in cases involving serious allegations of sexual misconduct:

> ➤ *Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018) (holding "if a public university has to choose between competing narratives to resolve a case, the university <u>must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder</u>") (emphasis added)

> ➤ *Doe v. N. Mich. Univ.,* No. 2:18-CV-196, 2019 WL 2269721, *5-6 (W.D. Mich. May 28, 2019) (rejecting motion to dismiss due process claim even though plaintiff admitted engaging in some non-consensual sexual contact with his accuser Jane Roe in part because "Plaintiff has plausibly argued that he was entitled to some form of cross-examination of Roe" since "[s]ome form of witness questioning before the decision-maker would have allowed [adjudicators] to 'choose between competing narratives' in making its findings.")

> ➢ *Smock v. Bd. of Regents of the Univ. of Mich.* 353 F. Supp.3d 651, 657-58 (E.D. Mich. 2018) (rejecting motion to dismiss procedural due process claims based on university prohibiting plaintiff from cross-examining witnesses in disciplinary proceeding involving allegations of sexual misconduct)

> ➢ *Powell v. Montana State Univ.,* No. 2:17-cv-15 SEH, Docket 134, p. 21 (MT Dec. 21, 2018) (citing lack of cross examination as basis for rejecting university's summary judgment motion to dismiss a due process claim because "[i]f a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process.")

> ➢ *Doe v. the Univ. of Colorado, Boulder,* Civil Case No. 1:18-cv-02243-LTB, 2019 WL 764568, *15 (D. Colo. Feb. 21, 2019) (rejecting motion to dismiss due process claim because "the lack of a full hearing with cross-examination provides evidence supporting a claim for a violation of [plaintiff's] due process rights.")

> ➢ *Doe v. Univ. of Mississippi,* 361 F. Supp.3d 597, 611-13 (S.D. Miss. 2019) (rejecting motion to dismiss due process claim based on university prohibiting plaintiff from cross-examining "witnesses whose accounts of the evening led to his discipline.")

> ➢ *Frost v. Univ. of Louisville,* 3:19-CV-227-CRS, 2019 WL 2288453, *12 (W.D. Ky. May 29, 2019) (requiring cross-examination in university sexual misconduct disciplinary proceedings)

> ➢ *Doe v. Rhodes College,* 2:19-cv-2336-JTF, Docket 33, Page Id 256 (W.D. Tenn. June 14, 2019) (same)

> ➢ *Doe v. Univ. of Cincinnati,* No.16-4693, 2017 WL 4228791, *5 (6th Cir. Sept 25, 2017) (finding cross-examination required in certain types of Title IX disciplinary proceedings)

> ➢ *John v. Miami Univ.* 882 F.3d 579 (6th Cir. 2018) (same)

> ➢ *Nokes v. Miami Univ.,* 1:17-cv-482, 2017 WL 3674910, *10-12 (S.D. Ohio Aug. 25, 2017) (same)

> ➢ *Doe v. Pennsylvania State Univ.,* No. 17-cv-1315, 2017 WL 3581672, *7-8 (M.D. Pa. Aug 18, 2017) (same)

➢ *Doe v. Pennsylvania State Univ.*, No. 4:18-cv-164, Docket 27, Page Id. 15-18 of 19, (M.D. Pa Aug 21, 2018) (rejecting university's motion to dismiss student's due process claim is based on concerns about meaningful lack of cross-examination)

➢ *Oliver v. Univ. of Texas Southwestern Med. Sch.*, 3:18-cv-1549-B, 2019 WL 536376, *13 (N.D. Tex. Feb. 11, 2019) (rejecting motion to dismiss procedural due process claim in part because university did not provide plaintiff with an opportunity to cross-examine plaintiff's accuser in a "live hearing")

➢ *John v. The Regents of The Univ. of California,* No. B283229 2nd App. Dist. 6th Div. at 2 (Oct. 9. 2018) (same)

➢ *John v. Univ. of Mississippi,* 361 F. Supp.3d 597, 611-13 (S.D. Miss. 2019) (rejecting motion to dismiss procedural due process claims because university had prohibited John from cross-examining "witnesses whose accounts of the evening led to his discipline")

➢ *Doe v. Univ. of Southern Mississippi,* No. 2:18-cv-153, Docket 35, p. 5-7 (S.D. Miss., Sept 26, 2018) (enjoining ongoing sexual misconduct disciplinary proceeding because university violated plaintiff's due process rights by denying him the right to cross-examination)

➢ *Jane Roe v. Javaune Adams-Gaton*, Case No. 17-cv-945, 2018 WL 5306768 (S.D. Ohio April 17, 2018) (enjoining university from imposing Title IX disciplinary sanctions against plaintiff because her procedural due process rights were violated since she was unable to cross-examine her accusers or adverse witnesses during her university disciplinary hearing)

➢ *Doe v. Univ. of Mich.*, No. 2:18-cv-11776-AJT-EAS, Page Id. 743, 739 (E.D. Mich. July 6, 2018) (enjoining disciplinary proceeding because university violated due process rights by not providing "the opportunity for a live hearing" where plaintiff could submit cross-examination questions to adjudicators to be asked of witnesses and reasoning, "[w]ithout a live proceeding, the risk of an erroneous deprivation of [p]laintiff's interest in his reputation, education, and employment is significant.")

➢ *Lee v. Univ. of New Mexico*, No.1:17-cv-01230, at 2, ECF No. 36 (D. N.M. Sept. 20, 2018) (rejecting motion to dismiss student's due process claim in part because university prohibited him from cross-examining witnesses and "the presentation of [such] evidence in his defense is essential to basic fairness")

➢ *Doe v. Marymount Univ.*, 297 F. Supp.3d 573, 584 (E.D. Va. Mar. 14, 2018) (rejecting motion to dismiss Title IX claim at private university in part because private university denied plaintiff right to cross-examine his accuser in Title IX proceeding)

➢ *Doe v. University of Southern California*, 28 Cal. App. 5th 26 (2018) (granting male plaintiff's writ of administrative mandate because university did not allow cross-examination during Title IX disciplinary proceeding);

➢ *Doe v. Claremont McKenna College*, 236 Cal. Rptr. 3d 655, 656 (2018) (same);

➢ *Doe v. Westmont College*, 34 Cal. App. 5th 622 (2019) (same);

➢ *Doe v. The Regents of The Univ. of California*, 28 Cal. App. 5th 44 (2018) (same);

➢ *Doe v. Allee*, 30 Cal. App. 5th 1036, 1061 (2019) ("We also agree with *Baum's* holding extending the right of cross-examination to the questioning of witnesses other than the complainant where their credibility is critical to the fact-finder's determination.")

163.    In sum, defendants denied John requisite due process because they disciplined him without any opportunity to cross-examine and confront his accuser or any other adverse witnesses.

164.    *Purdue denied John an investigation and hearing free of bias and conflict of interest*. Purdue deprived John of an investigation and hearing free of bias or conflict of interest. John is entitled to a hearing free of bias or conflicts of interest. Contrary to principles of fairness and impartiality, defendants Sermersheim and Wright were in charge of both the investigation and the adjudication of John's case.

165.    On information and belief, defendants Sermersheim and Wright deprived John of an investigation free of bias based in part on their own biases against men accused of sexual misconduct. Evidence supporting this belief includes, but is not limited to, defendants Sermersheim and Wright's findings in an unrelated sexual harassment investigation in 2019—a

finding that highlights their unequal, biased treatment of male students. In this factually similar case:

1. the complaining male student ("the Male") had difficulty maintaining an erection, so he moved behind the accused female student ("the Female") and they cuddled while spooning. The Female began rubbing her buttocks against his penis and he started to get an erection.

2. The Female asked the Male to put on a condom, which he did. This conduct—the act of putting on the condom—indicated a knowing, voluntary agreement to have sex.

3. The Female then got on top of the Male and placed his penis in her vagina. After starting to have sex, the Male lost his erection and said "no" to end further sexual activity. However, it was determined the Male's "no" meant he did not want sex in that position rather than wanting the sexual activity to stop.

4. Stated another way, it was determined the Female did nothing wrong when—over the Male's objection—she continued her efforts to insert Male's penis in her vagina and eventually did. Thus, when the Male said "no," he **was not** saying "no" to all further sexual activity.

166. Conversely, Wright's finding demonstrates that she predetermined Jane was credible by applying a different standard to the female complainant.

1. Here, by Jane's own admission, she placed the condom on John. Yet contrary to the determination in the case cited above, Wright concluded that Jane's conduct **did not** indicate a knowing, voluntary agreement to have sex.

2. Here, Jane initially decided to stop sexual activity and John did just that without objection. Soon thereafter, however, when cuddling and spooning, Jane restarted sexual activity by rubbing herself against John's groin and moaning.

3. Unlike the preceding case, however, John was supposed to understand that her initial decision to stop sexual activity was dispositive regardless of anything Jane said or did afterwards. Even though John asked then if Jane wanted to have sex, and even though she put the condom on him, John could not take her verbal "yes" or the fact that she put the condom on him as any indication of her knowing, voluntary agreement to have sex.

167.    Again, the differing standard Wright applied in these two cases reveals her bias: First, when a female says no, she means no, now and forever. But when the male says no, the female is entitled to disregard it. Second, when a man puts on a condom, his conduct evidences a knowing, voluntary agreement to have sex; but, when a woman puts a condom on a man, it says nothing about her willingness to have sex. Each is an example of a gender-based discriminatory and unequal application of the same facts.

168.    Consequently, defendants Sermersheim and Wright were not engaged in impartial fact-finding because their bias impacted their assessment of John's credibility and ultimate guilt. In sum, defendants deprived John of an investigation and hearing free of bias owing to gender-based stereotyping.

169.    Additionally, Purdue's Policy violated due process because John had no opportunity to question or challenge the Adjudicators for bias or partiality. On information and belief, defendant Sermersheim or Wright appointed the Adjudicators under Purdue Policy § (I)(5) which states:

> Within 15 days of receipt of the University Investigator's report, the Chancellor, Dean of Students or Director will convene a meeting with and seek advice from a three-member panel selected by the Chancellor, Dean of Students or Director from the Advisory Committee on Equity consisting of at least one participant who is a member of the faculty and one participant who is not a member of the faculty. At least two members of the panel shall be representatives of the campus from which the Formal Complaint originated. Prior to the meeting, members of the panel shall be furnished with a copy of the University Investigator's report and copies of any complaint or response of the parties. At the meeting, the panel will be afforded the opportunity to ask questions of the University Investigator. Upon request, the Complainant and the Respondent will be afforded an opportunity to meet with the Chancellor, Dean of Students or Director and the panel to make a brief statement and to answer any questions that they may have. Within 10 days following the meeting with the panel from the

> Advisory Committee on Equity, the Chancellor, Dean of Students or Director shall make a written determination whether a violation of one or both of the Policies has occurred. In the event the charge of discrimination and/or harassment is not substantiated following the written determination of the Chancellor, Dean of Students or Director, reasonable efforts may be taken to restore the Respondent(s) to their prior status.[43]

170.    Purdue, however, did not provide John with the names of the Adjudicators before the Panel Hearing. Therefore, he had no opportunity to raise a conflict of interest or bias objection based on information he might have discovered about their professional background, opinions or experiences—information that could be relevant to one's ability to adjudicate fairly a sexual misconduct complaint.

171.    The Adjudicators introduced themselves at the Panel Hearing, but John cannot recall their names and is unable to identify them for this Complaint. John recalls there were two female Adjudicators and one male Adjudicator, all of whom introduced themselves as Purdue employees.

## Purdue University Violated John's Protected Liberty Interest

172.    Purdue's disciplinary hearing deprived John of his protected liberty interest in his good name, reputation, honor, and integrity. Because John has a protected liberty interest in pursuing his education, as well as in future educational and employment opportunities, the University cannot deprive him of this right to occupational liberty without providing meaningful due process.

173.    When the Purdue defendants erroneously found John guilty of sexual misconduct and punished him based on a procedurally flawed and inadequate process, it violated his protected liberty interest.

---

[43]Ex. 2, Purdue Policy, at 31.

PAGE 43—COMPLAINT

174.    Courts that have examined the question of the impact of a sexual misconduct finding on a student's professional and academic standing or prospects recognize that it is severe and long-lasting. As one court put it, a sexual misconduct finding "may permanently scar [a student's] life and career . . ." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 573, 607 (D. Mass 2016). *Accord Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 638 (6th Cir. 2005) (discussing how the disciplinary violation will "interfere with later opportunities for higher education and employment.")

175.    Likewise, in *King v. DePauw University*, 14-CV-70, 2014 WL 4197507 (S.D. Ind. Aug. 22, 2014), the court correctly observed that even where a lawsuit challenging a disciplinary action is successful, the problem stems from the stigma of the disciplinary finding when it is disclosed.

176.    In fact, the Seventh Circuit's controlling decision in *Purdue* recognizes that a university violates this interest where "the state has inflicted reputational damage accompanied by an alteration in legal status that deprive[s] him of a right previously held." *Purdue*, 928 F.3d at 661 (citations omitted). The "alteration of legal status along with some stigmatic or reputation injury is commonly referred to as the 'stigma plus test.'" *Schepers v. Comm'r, Ind. Dep't of Corr.*, 691 F.3d 909, 914 (7th Cir. 2012).

177.    John finds himself in the same situation the plaintiff faced in *Purdue*, 928 F.3d at 652. There, the Navy ROTC expelled plaintiff from its ROTC program after learning of plaintiff's one-year suspension for sexual misconduct. On this fact, the Seventh Circuit held the plaintiff stated a liberty interest under the stigma-plus test:

> After conducting an adjudicatory proceeding, Purdue formally determined that [Doe] was guilty of a sexual offense. That determination changed [Doe's] status: he went from a full-time student in good standing to one suspended for an academic year.

> And it was this official determination of guilt . . . that allegedly deprived [Doe] of occupational liberty. It caused his expulsion from the Navy ROTC program (with the accompanying loss of scholarship) and foreclosed the possibility of his reenrollment in it. John has satisfied the "stigma plus" test.

*Id*. at 662-63 (internal citations omitted).

178.   John's case is no different. John's liberty interest was violated under the standard set out in *Purdue*. First, when the defendants formally determined John committed a sexual offense and imposed a one-year suspension, that suspension changed John's legal status. *Id*. at 662.

179.   Second, John's suspension will result in John's "disenrollment" (i.e., dismissal) from Army ROTC and brings and end to his aspiration of a military career.

180.   Following John's appeal, his ROTC superior, Lieutenant Colonel Schmidt, received a letter from Purdue notifying ROTC that John was suspended for one year for "sexual harassment" and "sexual violence." According to Lt. Col. Schmidt, the letter ROTC received means ipso facto that John will be disenrolled from the program and will not be permitted to commission in the army.

181.   The Lieutenant Colonel did not mince words when he told John, "by the letter of the law" he is obligated to disenroll John. The Lieutenant Colonel added bluntly, taking "the letter at face value, it reads like you should not commission in the army and you should go and find another line of work."

182.   Put simply, there is no disputing that Purdue's disciplinary action has changed John's legal status and destroyed John's professional military career.

183.   The disciplinary proceeding also forecloses other educational and professional opportunities. Should John seek entry into a graduate engineering program in lieu of the now-

foreclosed military career, John will have to disclose the disciplinary finding when applying for post-graduate programs.[44]

184.    If John failed to disclose Purdue's discipline on applications to law schools, graduate schools or licensing boards and the omission is subsequently discovered, the likely outcome would be sanctioning or possible expulsion from the academic institution.[45]

185.    As many courts recognize, it is virtually impossible for an accused student to obtain the educational or licensing credentials he seeks following an erroneous disciplinary decision. *See*, *e.g.*, *Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018) (noting "[t]ime and again, this circuit has reiterated that students have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct . . . [b]eing labeled a sex offender by a university has both an immediate and lasting impact on a student's life . . . [such as] difficulty obtaining educational and employment opportunities down the road . . ."); *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 638 (6th Cir. 2005) (discussing how disciplinary violation will "interfere with later opportunities for higher education and employment" is so clear as to almost be a truism"); *Furey v. Temple Univ*., 884 F. Supp.2d 223, 247-48 (E.D. Pa. 2012) ("Expulsion denies the student the benefits of education at his chosen school. Expulsion also damages the student's academic and professional reputation, even more so when the charges against him are serious enough to constitute criminal behavior. Expulsion is likely to affect the student's ability to enroll at other institutions of higher education and to pursue a career.")

186.    The bottom line is John will not escape the stigma of Purdue's finding—a stigma that will have a devastating, long-lasting impact on future military, educational and professional employment opportunities.

---

[44]Ex. 7, Garrett Decl. at ¶¶ 13-14.
[45]*Id*. at ¶ 17.

187.    This black mark on John's record impairs or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes John because he now has a record that notes findings of guilt for serious misconduct that he did not commit.[46]

188.    As a direct and proximate consequence of Purdue's due process violations, John has sustained significant damages including, but not limited to, having an academic and disciplinary record that improperly reflects that he was found to have committed sexual misconduct.

189.    The discipline Purdue imposed has permanently damaged John's liberty interest in potential career prospects, has denied him the benefits of education at his chosen school—Purdue University—and has damaged his reputation.

190.    Further, his suspension effectively prevents him from enrolling in another university of his choice. When applying to other schools John will be forced to explain an unexpected gap in his undergraduate studies. When asked why the unexpected departure, he will and must answer honestly.[47]

191.    As a sister court explained in a case involving Indiana University, the implication of disclosing a finding of sexual misconduct is the "inability to reenroll at another university." *Marshall v. Indiana Univ*., 170 F.Supp.3d 1201, 2016 (S.D. Ind. 2015). The court reasoned, "any subsequent university to which a student may apply always knows of the reasons for his prior dismissal. If he leaves without having earned his degree, the student must make an affirmative showing to any subsequent university to which he applies that he left the original university in good standing." *Id*.

---

[46]*Id*. at ¶ 10.
[47]*Id*. at ¶ 12.

<u>Summary of Count I</u>

192.    In conclusion, defendants violated the U.S. Constitution when Purdue deprived John of requisite due process and equal protection to reach a preordained result.

193.    Contrary to existing law, Purdue found John responsible based on undisclosed evidence—evidence contained in the Concealed Report. This was fundamental error: "[W]ithholding the evidence on which [Purdue] relied in adjudicating his guilt was itself sufficient to render the process fundamentally unfair." *Purdue*, 928 F.3d at 663.

194.    John was deprived a fair opportunity to review and examine the information defendants gathered. A thorough inspection and examination was needed for John to defend himself fully and fairly against the false allegations.

195.    Further, defendants presumed John's guilt and failed to examine critically the discrepancies in Jane's testimony. And based on fallacious belief of trauma's impact on memory, defendants disregarded Jane's inconsistent and implausible testimony, thereby resulting in an erroneous outcome—an outcome that could have been avoided had John received a fair hearing with the requisite due process protections.

196.    Defendant Wright employed gender-biased stereotypes to credit Jane's testimony over John's thus depriving John of a hearing free of bias.

197.    The Adjudicators accepted Jane's allegations as credible and truthful despite numerous inconsistencies and even though John had no opportunity to question or cross-examine Jane for bias or motive.

198.    As a direct and proximate result of the above conduct, John sustained significant damages, including, without limitation, reputational damage accompanied by an alteration in legal

status that deprived him of a right he previously held, economic injuries, and other direct and consequential damages. John's interests in the results of the disciplinary process are significant.

199.    Owing to the wrongfully imposed sanction, in addition to the loss of his military career, John will lose the benefit of ROTC stipends, and can expect to be disqualified from consideration for future scholarships.[48]

200.    Accordingly, John seeks injunctive relief, including but not limited to reinstatement at Purdue. John's request for injunctive relief is prospective because he seeks to enjoin: (a) the liability which Purdue threatens to inflict on John if he enters Purdue's campus or property; (b) Purdue's prohibition against his continued enrollment at Purdue for no less than one year; (c) Purdue's irreparable damage to John's future educational and employment opportunities, and (d) with a new disciplinary proceeding free of the and constitutional violations addressed in this Complaint and/or expungement from John's academic and disciplinary files of all information related to the unlawful suspension and flawed proceeding.

201.    Based on the allegations herein, John is also entitled to a declaration that Purdue's policies, as applied to John, violate the Due Process Clause of the United States Constitution such that the Purdue defendants must (i) reinstate John; (ii) provide him with a new disciplinary proceeding free of the and constitutional violations addressed in this Complaint; (iii) expunge John's academic and disciplinary files of all information related to the unlawful suspension and flawed proceeding; and (iv) prohibit Purdue from disclosing the wrongful suspension and related disciplinary proceeding to any third party. *See Doe v. Purdue Univ.,* 928 F.3d 652, 666-67 (7th Cir. 2019) (remanding case to district court for a determination if the plaintiff had a "liberty interest" based on his demand for an "expungement" based on the following decisions: "*Flint v.*

---

[48]*Id.* at ¶ 11.

PAGE 49—COMPLAINT

*Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (pursuing expungement of university records 'serve[s] the purpose of preventing present and future harm'); *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) (seeking to 'remove the negative notation from appellants' disciplinary records' is 'nothing more than prospective remedial action'); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (noting an 'F' grade and a plagiarism conviction 'constitute[d] a continuing injury to the plaintiff' and an action to remove them was 'prospective in nature'")

### COUNT II
### Fourteenth Amendment, 42 U.S.C. § 1983
### Equal Protection Clause Violation
(against Purdue defendants only)

202.     John repeats and re-alleges each and every allegation as if fully set forth herein.

203.     The Fourteenth Amendment to the United States Constitution provides in relevant

part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

204.     The preceding allegations of unconstitutional gender bias and sex discrimination (detailed in  paragraphs 164 through 168 and elsewhere in this Complaint) support John's claim that the Purdue defendants violated John's equal protection rights as guaranteed by the Fourteenth Amendment of the U.S. Constitution, and therefore, 42 U.S.C. § 1983.

205.     John is thus entitled to a declaration that Purdue policies as applied to John violated the Fourteenth Amendment such that defendant Purdue (i) must reinstate John as a student and provide a new disciplinary proceeding free from the bias and constitutional violations addressed in this Complaint; (ii) must expunge Doe's official and unofficial Purdue files of all information

related to his interactions with Jane, including but not limited to the disciplinary proceeding and the resulting sanctions served; and (iii) must refrain from disclosing any such information to any third-party.

WHEREFORE, regarding Counts I and II, John demands judgment and relief against defendants as follows:

    (a)  an order requiring the defendants to:

- reinstate John as a student and provide him with a new disciplinary proceeding free from the bias and constitutional violations addressed in this Complaint;

- expunge John's official and unofficial Purdue files of all information related correct John's academic and disciplinary record to remove any findings it issued concerning the sexual misconduct complaint and hearing of April 2020;

- notify Army ROTC of John's reinstatement; and,

- refrain from disclosing information about the 2020 disciplinary proceeding to any third party.

    (b)  an order awarding attorneys' fees and punitive damages pursuant to any applicable statute;

    (c)  a judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

    (d)  a judgment awarding pre- and post-judgment interest as may be permitted by law and statute; and

    (e)  a judgment awarding such other and further relief as this court may deem just, proper, equitable and appropriate.

//

//

//

//

## COUNT III
### (Violation of Title IX of the Education Amendments of 1972)
(against Purdue defendants only)

206.    John repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

207.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

208.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972.

209.    In academic year 2019-20, Purdue received millions of dollars in federal funds, student loans and grants.

210.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

211.    To establish Title IX liability, John must have "alleged facts, [which] if true, raise a plausible inference that the university discriminated against [Doe] 'on the basis of sex.'" *Doe v. Purdue Univ.*, 928 F.3d, 652, 668 (7th Cir. 2019).

212.    As detailed in paragraphs 164-168 above, Purdue's finding John guilty of non-consensual sexual contact with Jane was erroneous and based on facts that evidence a causal connection between John's erroneous discipline and gender bias.

213.    For the same reasons detailed in paragraphs 164-168 above, John satisfies the

elements of a selective enforcement claim, which requires a plaintiff "show that a similarly-situated member of the opposite sex was treated more favorably than [John] due to his . . . gender." *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016).

WHEREFORE, regarding Count III, John demands judgment and relief against Purdue as follows:

> (a) an order requiring Purdue to (i) reinstate of John as a student and provide John a new disciplinary proceeding free from the bias and constitutional violations addressed in this Complaint, and/or (ii) expunge John's official and unofficial Purdue files of all information related to his interactions with Jane, including but not limited to charges and sanctions served, and prohibiting Purdue from disclosing such information to any third party;

> (b) payment of damages to compensate John's past and future pecuniary and/or non-pecuniary damages;

> (c) judgment for attorneys' fees and/or punitive damages pursuant to applicable statute;

> (d) judgment for all other reasonable and customary costs and expenses incurred in pursuit of this action;

> (e) pre-judgment interest and post judgment interest as may be permitted by law and statute; or

> (f) such other and further relief as this court may deem just, proper, equitable, and appropriate.

## COUNT IV
### Declaratory Judgment
(against Purdue defendants only)

217.   John repeats and re-alleges each and every allegation as if fully set forth herein.

218.   John has a tangible legal interest in requiring that the Purdue defendants administer the University's policies, procedures and Title IX regulations and guidelines in a lawful manner.

219.   The Purdue defendants have violated John's rights under federal law, namely the Fourteenth Amendment of the United States Constitution.

PAGE 53—COMPLAINT

220.    John's education and future employment and career opportunities have been severely damaged. Without appropriate redress, the unfair and erroneous outcome of the Purdue Panel Hearing and appeal will continue to cause John irreparable harm.

221.    As a result of the foregoing, there exists a justiciable controversy concerning the outcome, permanency and future handling of John's student record at Purdue.

222.    Judicial intervention is not premature because unless the defendants' actions are enjoined, the University's unlawful disciplinary proceeding against John will continue.

WHEREFORE, regarding Count IV, John requests under 28 U.S.C. § 2201, a declaration

(a)    requiring the individual defendants reinstate John as a student and provide him with a new disciplinary proceeding free of the constitutional violations addressed in this Complaint;

(b)    stating that John has a legal right to enroll in Purdue classes;

(c)    expunging John's official and unofficial Purdue files of all information concerning the 2019 sexual misconduct complaint and related personal misconduct hearing, including but not limited to charges and sanctions served, and prohibiting defendants from disclosing such information to any third party;

(d)    enjoining defendants from:

- enforcing discipline or sanctions that resulted from the unconstitutional November 2019 hearing, and

- subjecting John to further disciplinary proceedings tainted by the constitutional violations addressed in this complaint;

(e)    awarding John attorneys' fees pursuant to any applicable statute; and,

(f)    such other and further relief as this court may deem just, proper, equitable, and appropriate.

## COUNT V
### Defamation Per Se
(against Jane Roe only)

223.     John repeats and re-alleges each and every allegation as if fully set forth herein.

224.     Jane made and published the Non-Privileged Defamation to be heard or read by persons in Indiana and intended that these defamatory statements damage John's personal and professional reputation. Jane's defamatory statements include:

        a.  telling Paul falsely that John sexually assaulted her; and

        b.  telling Mary falsely that John sexually assaulted her.

225.     Jane's defamatory statements made to Paul and Mary do not qualify as excited utterances because she made these statements well after her sexual encounter with John. Further, on information and belief, Jane made these defamatory statements to insulate herself against a charge of infidelity. She lied to Paul about a sexual assaulted before he could discover that she had had a voluntary sexual encounter with John.

226.     On information and belief, Jane falsely told Mary the same in an effort to vilify John and thereby secure Mary's allegiance in her favor and against John.

227.     In addition to the defamatory statements Jane made to Paul and Mary, on information and belief, Jane made other non-privileged defamatory statements to others intending to damage John's personal and professional reputation; defamatory statements that she knew and intended to be heard or read by persons in Indiana.

228.     Jane made and published the Non-Privileged Defamation with actual malice and reckless disregard of their falsity or with actual knowledge of their falsity.

229.     Jane did not make the Non-Privileged Defamatory Statements, which are the subject of this Count, in support of the University-initiated investigation and complaint against

John. Rather, Jane's Non-Privileged Defamatory Statements related to this count: (a) have no connection to the University-initiated investigation and complaint Jane made about John; (b) have no connection to any complaint Jane made about John to any governmental or quasi-governmental body; and (c) were not made in the presence of Purdue employees or any other governmental or quasi-governmental body involved in a disciplinary action against John.

230.    Jane's Non-Privileged Defamation has no connection to the University-initiated investigation because Jane did not file a report or bring a complaint seeking to have the University investigate John for sexual misconduct. Rather, Jane engaged in a pattern of defamatory statements to preempt any possible charge that she was unfaithful toward Paul.

231.    On information and belief, Jane's pattern of defamatory statements caused one person with whom she spoke well after her sexual encounter with John to report her false story to the University.

232.    As a direct and proximate result of Jane's Non-Privileged Defamation, John has suffered actual monetary damages, including legal fees defending John's reputation.

233.    As a direct result of Jane's Non-Privileged Defamatory Statements, John's character and reputation at Purdue and within the community at large has been damaged and he has suffered and will continue to suffer mental anguish, personal humiliation, and significant loss of reputation.

//

//

//

//

//

PAGE 56—COMPLAINT

## COUNT VI
## Defamation Per Quod
### (against Jane Roe only)

234.    John repeats and re-alleges each and every allegation as if fully set forth herein.

235.    Jane knew and intended that the Non-Privileged Defamation detailed in paragraph 211, above, to be heard or read by persons in the West Lafayette, Indiana and intended the defamatory statements to damage the professional and personal reputation of John.

236.    Jane made and published the Non-Privileged Defamation with actual malice and reckless disregard of its falsity or with knowledge of its falsity.

237.    As alleged in paragraphs 220-222, above, Jane did not make the Non-Privileged Defamatory Statements, which are the subject of this Count, in support of the University-initiated investigation and complaint against John. Jane's Non-Privileged Defamatory Statements related to this count: (a) have no connection to the University-initiated investigation and complaint Jane made about John; (b) have no connection to any complaint Jane made about John to any governmental or quasi-governmental body; and (b) were not made in the presence of Purdue employees or any other governmental or quasi-governmental body involved in a disciplinary action against John.

238.    As a direct and proximate result of Jane's Non-Privileged Defamation, John has suffered actual damage of a pecuniary nature, including legal fees defending John's reputation.

239.    As a direct result of Jane's Non-Privileged Defamation, John's character and reputation at Purdue and within the community at large has been damaged and he has suffered and will continue to suffer mental anguish, personal humiliation, and significant loss of reputation.

240.    As a further direct and proximate cause of Jane's Non-Privileged Defamation, John suffered consequences and damages, loss of employment opportunities and/or wages, loss of

educational opportunities, difficulty in gaining entrance to another university comparable to CCC, reduced future earning capacity, and attorneys' fees.

WHEREFORE, regarding Counts III and IV, John demands judgment against Jane as follows:

(a) for actual, special, and compensatory damages, including John's legal fees, in an amount to be determined at trial but no less than $75,000.00;

(b) for punitive damages in an amount sufficient to deter Jane from conducting similar future conduct but no less than $100,000;

(c) judgment for attorneys' fees, pursuant to applicable statute;

(d) judgment for all other reasonable and customary costs and expenses incurred in pursuit of this action;

(e) pre-judgment interest and post judgment interest as permitted by law and statute; and

(f) such other and further relief as this Court finds just and equitable.

DATED this 18th day of November 2020.          ROSENBERG & BALL CO. LPA

/s/ *Eric J. Rosenberg*

Eric J. Rosenberg (0069958)
395 North Pearl Street
Granville, Ohio 43023
740.644.1027 phone
866.498.0811 fax
erosenberg@rosenbergball.com

## <u>APPENDIX</u>

Index of Persons Pseudonymously Named in Complaint

| | |
|---|---|
| John Doe | Accused student/respondent in disciplinary proceeding |
| Jane Roe | Accusing student in disciplinary proceeding |
| Mary | John's former girlfriend and roommate and formerly friend of Jane |
| Jill | Friend of Jane and friend Jane spoke to the next day |
| Paul | Boyfriend of Jane |
| Ruth | Jane's roommate |